## In re CROWN POINT BRUSH CO.

(District Court, N. D. New York. November 25, 1912.)

1. BANKRUPTCY (§ 348*)—CLAIMS—PRIORITY—WAGES—"WORKMEN"—"SERVANT."

Bankr. Act July 1, 1898, c. 541, § 64b, 30 Stat. 563 (U. S. Comp. St. 1901, p. 3447), as amended by Act June 15, 1906, c. 3333, 34 Stat. 267 (U. S. Comp. St. Supp. 1911, p. 1507), provides that the debts of a bankrupt entitled to priority, aside from taxes, are wages due to workmen, clerks, traveling or city salesmen, or servants, earned within three months prior to the commencement of the proceedings, not exceeding $300 to each applicant. Claimants, father and son, were president and general manager, treasurer and assistant general manager, respectively, of the bankrupt corporation. The father performed only executive duties, while the son, in addition to keeping the books of the company, supplied brush bristles and fillers to the operators, carried brushes to the trimmers and to the paintshop, and packed them in boxes, for all of which he received $25 per week; there being no evidence as to the value of the services performed by him, other than his work in keeping books, etc. *Held*, that neither father nor son were entitled to priority for salary due from the corporation; the term "workmen," as used in the act, being intended to mean persons employed in manual labor, whether skilled or unskilled; an artificer, mechanic, or artisan; a handicraftsman; one who works in any department of physical or mental labor; and a "servant" as one who serves or attends a person employed by another and subject to his orders; one who labors for the benefit of a master or employer; an attendant; a subordinate assistant or agent.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 536; Dec. Dig. § 348.*

For other definitions, see Words and Phrases, vol. 7, pp. 6422–6429; vol. 8, pp. 7798, 7522–7523.]

2. BANKRUPTCY (§ 348*)—CLAIMS—PRIORITY—CLAIMS FOR SERVICES.

A state statute cannot enlarge the priority given by Bankruptcy Act July 1, 1898, c. 541, § 64b, 30 Stat. 563, as amended by Act June 15, 1906, c. 3333, 34 Stat. 267 (U. S. Comp. St. Supp. 1911, p. 1507) to workmen, traveling or city salesmen, or servants, etc.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 536; Dec. Dig. § 348.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Bankruptcy. In the matter of bankruptcy proceedings of the Crown Point Brush Company. Petition to review Referee James A. Leary's order denying the priority of claims of John Morrison, Sr., and John Morrison, Jr., for five weeks' salary preceding adjudication. Affirmed.

J. Ward Russell, of Glens Falls, N. Y., for trustee.
Henry W. Williams, of Glens Falls, N. Y., for claimants.

RAY, District Judge. The Crown Point Brush Company had from five to seven men in its employ. By the provisions of its by-laws it created the positions of "general manager," and "assistant general manager." It had a "president" and a "treasurer." John Morrison, Sr., a stockholder and director of the corporation, was made president and also general manager at a salary of $25 per week. His son, John Morrison, Jr., a stockholder and director of the corporation, was made treasurer and also assistant general manager at a salary of $25 per week.

[1] After adjudication, John Morrison, Sr., filed a claim for the nine weeks' salary preceding adjudication, $225, and John Morrison, Jr., filed a claim for the five weeks' salary preceding the adjudication, $125, and each claims priority. The referee allowed these claims as general claims, but denied them priority of payment.

By section 64 of the Bankruptcy Act of 1898 (Act July 1, 1898, c. 541, 30 Stat. 563), as amended to date (Act Feb. 5, 1903, c. 487, § 14, 32 Stat. 800; Act June 15, 1906, c. 3333, 34 Stat. 267 [U. S. Comp. St. Supp. 1911, p. 1507]), the *debts* of the bankrupt entitled to priority of payment, aside from taxes, are:

"(4) Wages due to workmen, clerks, traveling or city salesmen, or servants which have been earned within three months before the date of the commencement of proceedings, not to exceed three hundred dollars to each claimant, and (5) debts owing to any person who by the laws of the states or United States are entitled to priority."

There can be no pretense that these debts, or either of them, was entitled to priority of payment under any law or statute of the state of New York if not so entitled under the provisions of the Bankruptcy Act. Clearly the president and general manager of a corporation is not a clerk or a traveling or city salesman, even though he may incidentally and occasionally do some clerical work, or perform some clerical duties, or make some sales. The same may be said of the treasurer and assistant general manager of a corporation, even though the treasurer keeps his own books and makes his own entries. The duties of a "general manager" and of an "assistant general manager" are to manage, control, direct, guide the business; see that it is carried on pursuant to the policy or directions of the board of directors. If it should appear that a corporation employs a clerk to do or perform clerical duties at a fixed compensation or salary, and also empowers him to exercise certain powers of direction, supervision, and control or management, without added or extra compensation, he would be a clerk, within the meaning of the

law, and his claim for salary would be entitled to priority; but should it employ him as clerk to perform clerical duties and set him to perform the duties of general or assistant general manager, and have the clerical duties performed by others he would not be a clerk, and his wages would not be due to a clerk, but to a general manager, or to an assistant general manager, as the case should be. The law would not tolerate an evasion of that kind. Wages due the general manager of a business or corporation are not entitled to priority of payment. On the other hand, should a corporation employ a person to act as and perform the duties of general manager or assistant general manager at a fixed salary and, finding such services unnecessary, set him to perform the duties of clerk, floor sweeper, and furnace tender, he would be, in fact, either a workman or a servant, within the meaning of the law, and his claim for salary so earned would be entitled to priority. He would have the right to accept the inferior employment and perform its duties. But should he voluntarily, while holding the position of assistant general manager, perform manual labor assigned as part of his duty, he would not become a workman or servant, and entitled to priority. His character would be determined by what he was employed to do. Here, as assistant general manager, John Morrison, Jr., was to perform "such duties as the general manager shall prescribe." In a sense all employés of a corporation, from president down, are "workmen" or "servants." They work, and they serve. The Century Dictionary thus defines "workman":

"(1) A man who is employed in manual labor, whether skilled or unskilled; a worker; a toiler; specifically an artificer, mechanic or artisan; a handicraftsman. (2) In· general, one who works in any department of physical or mental labor; specifically a worker considered with special reference to his manner of or skill in work—that is, workmanship."

And it defines "servant" as:

"One who serves or attends, whether voluntarily or involuntarily; a person employed by another and subject to his orders; one who exerts himself or herself, or labors, for the benefit of a master or an employer; an attendant; a subordinate assistant; an agent."

The general manager in a sense works, and he works "in a department of both physical and mental labor." But this is not the meaning to be given to "workmen" or "servants," as used in the Bankruptcy Act. Section 64, subd. 4. The treasurer of a corporation is supposed to keep books; and it is his duty to do so. The corporation may employ a clerk or clerks to assist and do the mere clerical work; but if it does not, and the treasurer himself makes the entries, keeps the books, and does the necessary clerical work, he does not cease to be treasurer and become a workman, or a clerk, or a servant, within the meaning of the Bankruptcy Law. John Morrison, Jr., testified that he was the treasurer of the corporation. As such, and for performing all the duties of that office, it is expressly provided in the by-laws that he shall receive no salary or compensation. Sections 2, 7, and 8 provide as follows, in part:

Section 2:

"Officers as such, except the general manager and assistant general manager, shall receive no salary or compensation from said corporation."

Section 7:

"The general manager shall be elected by the board of directors; he shall be subject to the direction of the board of directors for the general management and supervision of the business of the corporation, including the employment, discharge and fixing the wages of employés, purchase of material, and disposition of the product, shall sign all notes, drafts, and other obligations, and perform such other duties in and about the corporation as the directors shall prescribe."

Section 8:

"The assistant general manager shall perform such duties as the general manager shall prescribe and in the absence or inability of the general manager to act, shall perform the duties of the general manager. He shall also, in the absence of or inability of the general manager to perform his duties, sign or indorse checks, notes, drafts, or other obligations of the corporation."

As to what he actually did during the five weeks in question, John Morrison, Jr., testified as follows:

"Q. Your father was general manager over you? A. Yes, sir. Q. State whether or not he gave you any instructions as to what to do. A. He did; he told me all of my duties. Q. Tell us in detail just what kind of work you did five weeks prior to going into bankruptcy. A. We had five men working in the factory, and I cut all the bristles and supplied what they call the filler for all the brushes, and took them to the sandworkers. Q. That is the next operation? A. Yes, sir. Then I took them over to the trimmer. Q. Physically carried them? A. Yes, sir. Trimmed all the brushes and took them upstairs. Q. Physically carried them up? A. Took them up on the elevator. After the work was dry, I took it out to the paintshop, did them up in tissue paper, and packed them in cases. I did the packing and shipping. Q. You also kept the books, did you not? A. Yes, sir; kept all the books. Q. That is all you did during the last five weeks? A. That is all. Q. Will you state what was the actual value per week of your services during that period? A. Twenty-five dollars."

That is, in addition to keeping the books, he did some physical labor, but just how much does not appear; and the value of such work, outside of keeping the books, does not appear. That the corporation ever employed him to do this physical labor outside of bookkeeping as work outside of his duties as assistant general manager is not proved. Clearly he cannot recover anything for keeping the books. For the other work as assistant general manager, his counsel asserted, and it was accepted as true, he was to have $25 per week. As assistant general manager he was to—

"perform such duties as the general manager shall prescribe and in the absence or inability of the general manager to act, shall perform the duties of general manager. He shall also, in the absence of or inability of the general manager to perform his duties, sign or indorse checks, notes, drafts, or other obligations of the corporation."

John Morrison, Jr., also testified that during the five weeks his father was present and performed his duties as general manager. As the father was general manager and directed the son, as assistant general manager, as to his duties, it is presumed he made it one of his

duties, as such assistant manager, to cut the bristles, supply the filler for the brushes, and take them on the elevator to the sandworkers, and thence to the trimmer, and thence to the paintshop, where he did them up in tissue paper and shipped them. There was some physical labor involved in this, but how much, and its value, does not appear. He was also keeping the books, as treasurer, for which he was not entitled to any compensation. It was not possible, in the absence of evidence, for the referee to separate the bookkeeping from the other duties and fix a value on the latter. Quite likely an assistant general manager would be expected to cut the bristles, in order to know they were properly cut, to supply the filler to see that it was supplied in proper quantities and not wasted, to accompany the goods from one department to another to see they were properly delivered, and pack them himself to insure proper packing and counting and delivery to the trade or customers. But the doing these things, involving some physical activity and labor, did not necessarily constitute him a workman or servant. The corporation had from five to nine workmen or laborers in the plant, not counting the general manager or assistant general manager, who were under the general direction of the general manager and his assistant, and there is no evidence the work done by John Morrison, Jr., was ever done by a laborer or a workman.

John Morrison, Sr., did nothing except perform the duties of general manager and president and supply some money from his own funds to carry on the business. In his filed claim he did not allege that he was entitled to a preference or to priority of payment. It is, of course, true that, in the absence of a statute prohibiting a corporation to hire its president, or treasurer, or general manager, or assistant general manager, or a director, to do the work of a mechanic or common laborer, it may do so, and for such labor under such an employment he would be entitled to priority. In other words, these officers are not disqualified from hiring to the corporation to do any kind of work. But that is not the question here. John Morrison, Sr., was not employed or hired to do anything except perform the duties of general manager; and that is all he did do. He was to have a salary; but this did not constitute him a workman, servant, or clerk, within the meaning of section 64b (4) of the Bankruptcy Act. In re Albert O. Brown & Co., Ex parte Olmstead, 22 Am. Bankr. Rep. 496 (D. C.) 171 Fed. 281, per Judge Hand, Southern District of New York. See, also, Matter of Ellery H. Smith, 11 Am. Bankr. Rep. 646. Counsel for the claimant here urges that, inasmuch as subdivision 27 of section 1 of the Bankruptcy Act provides that "wage-earner shall mean an individual who works for wages, salary, or hire at a rate of compensation not exceeding one thousand five hundred dollars per year" (30 Stat. 544, U. S. Comp. St. 1901, p. 3420), both John Morrison, Sr., and John Morrison, Jr., are within the language of section 64, "debts which have priority: * * * Wages due to workman," etc. But this contention has been set at rest by the decision of the Circuit Court of Appeals in this the Second Circuit, in

Re Gurewitz, 10 Am. Bankr. Rep. 350, 121 Fed. 982, 58 C. C. A. 320. There the court, in reference to section 64, said:

"There is nothing ambiguous about the use of the word 'wages' in this connection. It means the agreed compensation for services rendered by the workmen, clerks, or servants of the bankrupt—those who have served him in a subordinate or menial capacity, and who are supposed to be dependent upon their earnings for their present support. Whether their employer has agreed to pay them by the hour, the day, the week, the month, or by the 'job' or piece, is wholly immaterial."

And, in reference to subdivision 27 of section 1, held:

"The reason for a concise definition of 'wage-earner' is made apparent by an examination of section 4b, 30 Stat. 547 (U. S. Comp. St. 1901, p. 3423), which provides that 'any natural person, except a wage-earner or person engaged chiefly in farming or the tillage of the soil, * * * may be adjudged an involuntary bankrupt.' When a wage-earner was thus excepted from the operation of the involuntary features of the act, it became necessary to define with precision the meaning of the term. We are, however, of the opinion that the definition has no application to the present controversy, for the reason that the defined word is not found in section 64b (4), 30 Stat. 563 (U. S. Comp. St. 1901, p. 3447)."

[2] As to the statutes of the state of New York and the decisions of the Court of Appeals of that state in relation thereto (Matter of Stryker, 158 N. Y. 526, 53 N. E. 525, 70 Am. St. Rep. 489, and prior cases), this court had them under consideration, with eminent counsel on both sides, in Gay et al. v. Hudson River Electric Power Co. et al. (C. C.) 178 Fed. 499, and it is unnecessary to repeat here what was said there. Section 8 of chapter 415, Laws of N. Y. 1897, provides:

"Sec. 8. Payment of Wages by Receivers. Upon the appointment of a receiver of a partnership or of a corporation organized under the laws of this state and doing business therein, other than a moneyed corporation, the wages of the employés of such partnership or corporation shall be preferred to every other debt or claim."

Section 2 of the act defines certain words used in the act, and, so far as material, reads as follows:

"Sec. 2. Definitions. The term employé, when used in this chapter, means a mechanic, workingman or laborer who works for another for hire. The person employing any such mechanic, workingman or laborer, whether the owner, proprietor, agent, superintendent, foreman or other subordinate, is designed in this chapter as an employer."

While in a sense each claimant here was an "employé" of the bankrupt corporation, neither was an employé within the very definition of the statute, as neither was a mechanic, a workingman, or laborer, as those words are commonly understood. One was the president and general manager, the other the treasurer and assistant general manager; and each had a salary as manager and assistant manager, respectively. Both, prior to bankruptcy, would have repudiated the idea that they were either workingmen or laborers in the employment of the corporation, and, as such, subject to their own orders and directions as general manager and assistant general manager respectively, in which capacity, and that alone, respectively, they were employed

and to be paid by the corporation. Both were stockholders and directors, and, as such, interested in the success and financial prosperity of the corporation; and hence, undoubtedly, each was willing to put his "hand to the wheel" and do more or less labor as necessity demanded. But their claims filed are for the weekly salary agreed to be paid them for performing the duties of general manager and assistant general manager, respectively. And it is immaterial whether we denominate that weekly compensation "wages" or "salary." The burden is on persons claiming preferences to bring themselves, by evidence, within the statute. People v. Remington, 45 Hun (N. Y.) 329, 338, affirmed 109 N. Y. 631, 16 N. E. 680.

Attention is called to In re Swain Co., 28 Am. Bankr. Rep. 66 (D. C.) 194 Fed. 749. I fully concur in that decision, and it accords fully with what I have stated even more strongly. In that case Ormsby, the claimant, was in name a stockholder, but no stock was ever issued to him. He was also an officer, but performed formal duties only, if any. He was actually employed as and performed all the duties of steward of the corporation for wages to be paid, and he was not to be compensated as an officer. The court said:

"The facts agreed upon show that the claim was one for wages earned as a steward of the bankrupt's restaurant, and that no portion of such claim was for his services as director or secretary of said corporation."

The fact that he was a nominal stockholder with no stock, and secretary in name with only formal duties, but actually steward at an agreed rate of wages, made him an employé and a workman; and, as his claim was for his wages as workman, and for that alone, he was, of course, entitled to priority. But here John Morrison, Jr., was an actual stockholder, an actual director, the actual treasurer, with the duty of keeping the books imposed on him as such, without compensation, which he did, having no clerk or bookkeeper, and the actual assistant general manager at an agreed weekly salary of $25 per week as such, and having imposed on him in that capacity the duty of performing such duties as should be assigned him by the general manager, and the work done by him was assigned by the general manager, and his claim is for five weeks of that salary agreed to be paid him as assistant general manager. His claim to preference is based on the fact that the duties assigned him by the general manager were such as called for the doing of some physical labor, which he performed. He also kept the books, and he says (leaving out the agreed salary) that the work done by him (in keeping books and doing the other work) was worth $25 per week. However, he does not state how much time was devoted to keeping the books; nor does he show the value of the work done aside from keeping the books. And it does not appear that the physical work assigned to and done by him aside from bookkeeping was not such as was expected of him when employed as assistant general manager. In fact, it cannot be surmised or assumed that the general manager assigned him to the performance of any work or duty not contemplated as within the scope of his employment as assistant general manager. The editor of a newspaper employed by a

corporation at a stated salary is not entitled to priority. Matter of Zotti, 23 Am. Bankr. Rep. 607 (D. C.) 178 Fed. 304. Still an editor writes editorials. He uses his hands, as well as his mental faculties.

In considering claims to priority under subdivision 5 of section 64b of the Bankruptcy Act, it must be remembered that the state statute has no application to enlarge the priority given by the Bankruptcy Act to a certain class of claims or claimants. Collier on Bankruptcy (9th Ed.) 908, where it is said:

"It must be remembered, too, that this subdivision [5, § 64b] has no application where the state statute gives priority to a class already given priority by the bankruptcy law. The bankrupt act not only controls the state law in case of absolute conflict, but by its express regulation of those priorities excludes the state law altogether."

In re Lewis, 4 Am. Bankr. Rep. 51 (D. C.) 99 Fed. 935; Matter of Slomka (C. C. A., 2d Circuit) 9 Am. Bankr. Rep. 635, 122 Fed. 630, 58 C. C. A. 322. Hence the fact that in dealing with workmen, clerks, traveling or city salesman and servants the state law may be broader and more liberal than the Bankrupt Act is no warrant for enlarging the priority given those classes by the Bankrupt Act. The claimants here allege they belong to one of the classes—workmen, clerks, or servants. The Bankruptcy Act gives priority to each of those classes; and hence the Bankruptcy Act itself controls the decision of this case, whatever the state court may have held as to the breadth and scope of the statutes of the state giving priority to the same classes. Officers of corporations are in no sense workmen. In re Grubbs-Wiley Co., 2 Am. Bankr. Rep. 442 (D. C.) 96 Fed. 183; In re Carolina Cooperage Co., 3 Am. Bankr. Rep. 154 (D. C.) 96 Fed. 950. This, of course, applies to the general manager and assistant general manager; and their salaries as such could not be entitled to priority. Therefore the treasurer of a corporation who keeps his own books, there being no provision for a clerk to do that work, is not a clerk or a servant of the corporation, within the meaning of the Bankrupt Act. But, as stated, a person might be employed by a corporation to do service as general manager or assistant general manager for six hours each day and as a common laborer or workman the balance of the day; but it would be incumbent on the claimant, in order to establish priority as a workman, to establish that he was employed, hired, in the dual capacity, and show how much of his agreed compensation, wages, or salary was for his services as workman. So a stockholder, or a director, or the treasurer, of a corporation might be employed by the corporation to do the work of a common laborer at an agreed compensation; and should this be actually done, and the work performed, who can doubt that such employé, as to such work, would be entitled to priority?

The claimant John Morrison, Jr., claims that it appears from the evidence that there was some sort of employment outside of assistant general manager; but I can find nothing to sustain the contention. In answer to the question whether, at any meeting of the board of di-

rectors, it was voted that he should have $25 per week for the five weeks prior to going into bankruptcy, he said:

"At our last meeting * * * during the last two months the discussion often came up regarding expenses, etc., and I had talked of leaving the company and going elsewhere to seek a position; but they encouraged me to remain. Said they were going to try to reduce expenses, and they wanted me to stay there, because I knew so much of the business; and they figured that I could jump from one department to the other and probably do practically all the different kinds of work."

He says Mr. Garvey and Mr. Closson and his father and himself were present at the time. Later he said of this meeting:

"Come to think of it, the meeting which I had in mind was not a meeting. It was not called as a regular meeting, but two of the directors were asked to come down and talk over the situation. It was really a conference. Q. Between whom? A. Mr. Garvey, Mr. Closson, myself, and Father."

Later he said this was within a week or ten days of the bankruptcy. He was also asked:

"Had you done practically the same work prior to the last five weeks that you did during the last five weeks? A. Yes. Q. But you got no pay for that? A. No."

This is very far from establishing any agreement or understanding that he was to have compensation for this physical labor, described as something outside of or not a part of his regular duties as assistant general manager, but with the other evidence shows that for over a year he had been paid $25 per week as assistant general manager, and that during that time he had done the same work practically he did during the last five weeks without other compensation.

The referee was right in allowing the claims of John Morrison and John Morrison, Jr., as general claims and in refusing them priority.

Affirmed.